IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA BROYLES,<br><br>            Plaintiff,<br><br>   v.<br><br>A.U.L. CORPORATION LONG-TERM DISABILITY INSURANCE PLAN,<br><br>            Defendant.<br>_____/<br>STANDARD INSURANCE COMPANY,<br>            Real Party in Interest<br>_____/ | No. C-07-5305 MMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT UNDER RULE 52; GRANTING DEFENDANT'S CROSS-MOTION FOR JUDGMENT UNDER RULE 52; GRANTING DEFENDANT'S MOTION TO STRIKE; FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>[Docket Nos. 46, 51, 52] |

    Before the Court are (1) plaintiff Patricia Broyles's ("Broyles") motion for judgment and (2) defendant A.U.L. Corporation Long-Term Disability Insurance Plan and real party in interest Standard Insurance Company's ("Standard") opposition and cross-motion for judgment,[1] each brought pursuant to Rule 52 of the Federal Rules of Civil Procedure. Having read and considered the parties' respective submissions filed in support of and in opposition to the motions, the Court hereby rules as follows.

---

    [1]Although not titled as such, defendant's filing is both an opposition and a cross-motion.

**BACKGROUND**

Broyles worked as a claims payable adjuster for the A.U.L. Corporation beginning in 1998. In September, 2005, she ceased work and applied for disability benefits through a long-term disability plan ("LTD plan" or "the Plan") issued by Standard Insurance Company ("Standard" or "plan administrator"). The LTD plan is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"). Standard issued the policy constituting the Plan, and is responsible for determining whether an employee qualifies for disability benefits under the terms of the Plan.

### A. Terms of the Long-Term Disability Plan

The Plan provides benefits to covered employees who meet the Plan's definition of disability. For the first twenty-four months that an employee claims benefits, the Plan requires that the employee be "unable to perform with reasonable continuity the Material Duties of [the employee's] own occupation." (Administrative Record ("AR") 445.)[2] After twenty-four months, a claimant must be unable to perform the Material Duties of any occupation for which he or she is qualified by reason of "education, training or experience." AR 444. "Material Duties" are defined as "the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation." Id. Broyles's occupation was defined by her employer and the plan administrator as sedentary. AR 409.

Under the terms of the Plan, an employee's coverage terminates upon the occurrence of certain specified events. In that regard, the Plan provides:

> Your insurance ends automatically on the earliest of:
>
> . . . .
>
> (4) the date your employment terminates.
>
> (5) the date you cease to be a Member. However, your insurance will be

---

[2]Each page of the Administrative Record bears various sets of numbers. For ease of reference, the Court uses herein the last three digits of the Bates stamp.

1  continued during the following periods when you are absent from Active
2  Work, unless it ends under any of the above.
3  . . . .
4  (b) during a leave of absence if continuation of your insurance under
5  the Group Policy is required by a state-mandated family or medical
6  leave act or law.

AR 446.

## B.   Broyles's Claim for Benefits

On March 18, 2005, Broyles underwent surgery to repair the collapsed arch in her right foot. AR 190. When she returned to work in April, she had a cast on her leg and used a wheelchair to get around. AR 291. Initially, Broyles's recovery from the surgery progressed smoothly. On June 13, 2005, her orthopedic surgeon, Dr. Pfeffer, noted that she was "doing well" and that she could tolerate weight-bearing activities with the use of an orthotic device. AR 201. Later in the summer, however, she experienced some setbacks in her recovery, and at an August 12, 2005 follow up visit, Dr. Pfeffer noted significant swelling in her foot. AR 184.

Thereafter, on September 13, 2005, Broyles was demoted and relieved of her supervisory responsibilities. AR 324. She ceased work on September 14, 2005. AR 173. The following day, September 15, 2005, Broyles again visited Dr. Pfeffer. Dr. Pfeffer's office notes from that visit do not include any notation to the effect that Broyles was advised to stop working. AR 204. On November 28, 2005, however, Broyles applied for benefits under the Plan, claiming disability as of September 15, 2005. AR 277-79.

As part of the claims process, Standard obtained Broyles's medical records and sent an Attending Physician's Statement ("APS") form to Dr. Pfeffer. Dr. Pfeffer's notes on the APS form are brief and not fully responsive to the inquiry. For example, where the form asks for the "date you recommended patient should stop working," Dr. Pfeffer responded "Yes." AR 181. Similarly, a subsequent section of the form asks: "What reasonable work or job site modifications could the employer make to assist the individual in return to work?"

3

Dr. Pfeffer responded, "sedentary work."  Id.

On March 28, 2006, Standard notified Broyles by letter that it had denied her claim. Standard noted therein that Broyles's job was sedentary, and, citing Dr. Pfeffer's responses on the APS form, found Broyles was able to perform the material duties of that sedentary position.  AR 409-10.  The letter further advised Broyles that she had the right to appeal the determination, and that she could submit additional information demonstrating why she was unable to perform sedentary work.  AR 408.

In April 2006, Broyles had total knee replacement surgery on her left knee, and thereafter, in October 2006, was tentatively scheduled for total knee replacement surgery on her right knee in 2007.  AR 254.[3]

On July 25, 2006, Broyles notified Standard that she was starting the appeals process and intended to submit additional medical records and letters from her treating physicians.  AR 373.  In the following months, several Standard employees had follow-up conversations with Broyles to make sure they had received all the information that she planned to submit.  AR 379-84.  Broyles was assisted by counsel in her appeal, and her counsel provided copies of Broyles's medical records, physical therapy records and prescription medication records.  In particular, Broyles obtained a letter from Dr. Shifflett, her knee surgeon, who began treating her in February 2006.  In his letter, dated October 11, 2006, Dr. Shifflett stated that in his opinion, Broyles was "unable to do her regular job, which requires prolonged sitting."  AR 254.  Additionally, Broyles obtained a letter from Dr. Pfeffer, dated November 11, 2006, supplementing the responses he had given on the APS form.  In that letter, Dr. Pfeffer provided his opinion that Broyles "has been incapable of working in her own and any other occupation either on a full or part time basis, including doing sedentary work, since September 15, 2005."  AR 390.

Standard forwarded Broyles's claims file to Dr. Waldram, an independent physician

---

[3]It appears that the latter surgery had not been performed as of the time Standard issued its final denial in March 2007.  See AR 421.

4

consultant ("IPC") who is Board certified in orthopedics.[4]  Based on his review of the file, Dr. Waldram concluded: "I do not see how specifically status post total knee or status post surgery for flat foot would be troublesome in a sitting posture."  AR 265.  Consequently, in Dr. Waldram's opinion, Broyles "could work at a sedentary level job on a full time basis."  Id.

On February 7, 2007, Standard notified Broyles that it had denied the appeal of her claim.  AR 416.  In that letter, Standard stated it had received and reviewed the additional records and physicians' letters Broyles had submitted, but that it found Broyles was capable of engaging in sedentary work, citing the opinion of its IPC Dr. Waldram.  AR 416.  The letter also informed Broyles that any disability resulting from her knee surgery was not covered under the Plan.  In that regard, Standard advised Broyles that she was on unpaid leave under the Family Medical Leave Act until December 8, 2005, after which time her coverage under the Plan automatically terminated, and that because her knee surgery was not performed until April 2006, it was not covered.  AR 414.

After the denial of her appeal, Broyles's file was automatically sent to the Administrative Review Unit ("ARU"), a separate division within Standard, for an additional level of review.  The ARU retained Dr. Mandiberg, a physician Board certified in orthopedics, to conduct a second IPC review of Broyles's file.  Dr. Mandiberg concluded: "I cannot see why [Broyles] cannot do a sit-down job with the ability to stand up and move around as needed."  AR 274.  In Dr. Mandiberg's opinion, Dr. Shifflett and Dr. Pfeffer's proffered assessments were not supported by the medical records.  Id.

On March 15, 2007, Standard issued its final denial of Broyles's claim.  The denial letter stated that the medical records did not support Broyles's treating physicians' conclusions that she was unable to engage in sedentary work.  AR 419-424.  The letter further advised Broyles of her right to file suit under ERISA to recover benefits.  On October

---

[4] It is unclear from the record whether Dr. Waldram received a copy of Dr. Pfeffer's November 11, 2006 letter.  The letter was provided to Dr. Mandiberg, Standard's second IPC, and both consultants were provided with a copy of Dr. Shifflett's October 11, 2006 letter, which stated his opinion that Broyles was not able to engage in sedentary work.

18, 2007, the instant action was filed.

## DISCUSSION

Broyles seeks herein disability benefits under the Plan pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), which statute affords a plan participant a cause of action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Id.

**A.   Legal Standard**

   **1. Abuse of Discretion Standard**

The standard of review applicable to a plan administrator's denial of ERISA benefits is dependent upon the terms of the benefit plan. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If, "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," an abuse of discretion standard is applied; otherwise, the denial is reviewed de novo.

In the instant action, by order filed July 28, 2008, the Court denied plaintiff's request for de novo review and found the standard of review applicable herein is abuse of discretion. (See Order Denying Plaintiff's Motion for De Novo Standard of Review ("July 28 Order").) In so ruling, however, the Court explained that it would "take any evidence of [ ] structural conflict of interest into consideration when conducting a review for abuse of discretion." (See id. at 2 (citing Metropolitan Life Ins. Co. v. Glenn, ___ U.S. ___, 128 S. Ct. 2343, 2351 (2008)); Abatie v. Alta Health Life Ins. Co., 458 F.3d 955, 967 (9th Cir. 2006) (en banc).)

In Glenn, the Supreme Court held that even where the plan administrator has a conflict of interest, for example, where it acts both as the funding source of the plan and evaluates claims made thereunder, the standard of review remains deferential. Id. at 2350-51. Such conflict, however, is a "factor" that the court must "take into account" along with other relevant factors in assessing a plan's exercise of discretion. Id. at 2351. As the Supreme Court explained, such conflict "should prove more important (perhaps of great

6

importance) where circumstances suggest a higher likelihood that it affected the benefits decision" and "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." Id. at 2351.

Similarly, the Ninth Circuit has held that where the plan administrator has a conflict of interest, a court should apply an "abuse of discretion review, tempered by skepticism commensurate with the plan administrator's conflict of interest." Abatie, 458 F.3d at 959. To determine the level of skepticism to apply, a court must consider "all the facts and circumstances." Id. at 968. As the Ninth Circuit, in Abatie, explained:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

Id.

**2. Consideration of Outside Evidence and Defendant's Motion to Strike**

When evaluating an ERISA administrator's denial of benefits, a court "may, in its discretion, consider evidence outside the administrative record to decide the nature, extent and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established." Id. at 970. In making a disability determination on the merits, a court may consider evidence outside of the administrative record only when procedural irregularities prevented full development of the administrative record. Id. at 973.

Here, Broyles urges the Court's consideration of two pieces of evidence outside the administrative record. First, Broyles offers a declaration by Dr. Pfeffer, dated October 10, 2008, in which Dr. Pfeffer more fully explains his opinion that plaintiff is not able to engage in sedentary work and to which he attaches several documents, including his Curriculum Vitae and additional medical records. (See Decl. of Glenn Pfeffer, M.D., filed Oct. 10,

7

1  2008.) Second, Broyles offers a declaration by her attorney, attaching an award of benefits
2  by the Social Security Administration ("SSA") dated June 3, 2007, which determination was
3  made after Standard's final review of Broyles's claim but was based on a finding that
4  Broyles was disabled as of September 15, 2005, the date of disability Broyles claimed
5  under the LTD plan. (See Decl. of Laurence F. Padway, filed Oct. 10, 2008.)

6  The extrinsic evidence offered by Broyles does not serve to inform the Court's
7  determination as to the effect of the instant structural conflict on Standard's decision-
8  making process. Neither the declaration by Dr. Pfeffer nor the SSA benefit award was
9  available at the time Standard made its decision to deny benefits, and, consequently, the
10 plan administrator cannot be said to have abused its discretion in not having considered
11 them. Nor has Broyles identified any procedural irregularities that in any manner prevented
12 full development of the administrative record. Rather, as discussed below, the
13 administrator clearly advised Broyles as to what additional evidence was required to
14 support her claim and gave her ample opportunity to submit additional documentation,
15 including a letter from Dr. Pfeffer.[5] Moreover, SSA disability determinations are not binding
16 on ERISA administrators because the two determinations are based on different standards.
17 Madden v. ITT Long Term Disability Plan, 914 F.2d 1279, 1286 (9th Cir. 1990). Notably,
18 unlike an ERISA administrator, the SSA is required to defer to the opinion of the claimant's

---

[5]The Court is not persuaded by Broyles's contention that she is entitled to supplement the record because the plan administrator, late in the appeals process, articulated a new basis for denying her claim, specifically, that there was no evidence that she was unable to sit due to her foot condition. Although the plan administrator used slightly different language in each denial, its grounds for denial remained unchanged and were clearly communicated to Broyles. The initial denial letter stated that in order to perfect her claim for benefits, Broyles needed to submit evidence demonstrating that she was "unable to perform sedentary work." AR 408. The letter denying her first appeal stated that based on a review of her file, the physician consultant "does not see how specifically status post total knee or status post surgery for flat foot would be troublesome in a sitting posture." AR 415. The final denial letter stated that "medical records do not support that you would have been unable to perform sedentary level work." AR 420. Because the administrator did not base its denial on a new ground after the administrative record was closed, plaintiff is not entitled to supplement the record with outside information. See Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 871-72 (9th Cir. 2008) (allowing plaintiff to present additional evidence when plan administrator relied on newly articulated rationale in its final denial of claim).

8

treating physician.  See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 829-30 (2003).

Accordingly, defendant's motion to strike the above-referenced declarations is GRANTED.

**3. Factors Warranting Increased Skepticism**

Broyles contends that, even without considering the additional declarations, the evidence in the administrative record demonstrates Standard's decision to deny benefits should be viewed with increased skepticism.  In that regard, Broyles argues that the administrator failed to adequately explain what information she had to submit to qualify for benefits, and failed to fully investigate her claim.  As set forth below, however, the record does not support Broyles's contentions.

When determining a claim for benefits, ERISA administrators have a duty to adequately investigate the claim.  Boonton v. Lockheed Medical Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997).  In carrying out that duty, a plan administrator is required to engage in "meaningful dialogue" with the claimant, and, in particular, "[i]f benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis of the denial."  Id.  Further, "if the plan administrators believe more information is needed to make a reasoned decision, they must ask for it."  Id.  As reflected in the record herein, the plan administrator fully met its obligations.

First, Standard clearly explained to Broyles the kind of additional information that would be required to support her claim.  Although Broyles asserts Standard never asked her or her treating physicians to explain why she could not perform sedentary work, the initial letter denying her claim expressly made just such a request.  Specifically, that letter stated: "Additional information which would be helpful to a reconsideration of your claim should include medical documentation that supports your limitations and restrictions . . . [and your claim that you] are unable to perform sedentary level work."  AR 408.  In response, Broyles submitted additional documentation, including physical therapy records,

1 additional medical records relating to her knee replacements, as well as letters from Dr.
2 Pfeffer and Dr. Shifflett, each stating his opinion that Broyles was not able to work. In
3 addition, the record demonstrates that Broyles had multiple conversations with one of the
4 administrator's disability benefits analysts, who followed up with her to make sure Standard
5 had received all of the additional information she planned to submit and afforded her
6 multiple extensions of the deadline for such submissions in order to ensure she had time to
7 assemble letters from her doctors. AR 379-84.

8 Broyles also contends the administrator failed to adequately investigate her claim
9 because it relied on a review of her medical records rather than ordering an independent
10 medical examination. Contrary to Broyles's contention, however, ERISA does not require a
11 plan administrator to obtain an independent medical examination, and consulting
12 physicians' opinions based on reviews of medical records are an acceptable basis of an
13 administrator's determination. See Jordan v. Northrop Grumman Corp. Welfare Benefit
14 Plan, 370 F.3d 869, 879-80 (9th Cir. 2004) (holding plan administrator, in accepting opinion
15 of "reviewing physician" over opinion of plaintiff's treating physicians, did not abuse
16 discretion), overruled on other grounds by Abatie, 458 F.3d 955; see also Kushner v.
17 Lehigh Cement Co., 572 F. Supp.2d 1182, 1192 (C.D. Cal. 2008) (holding ERISA does not
18 require independent medical examinations).

19 Additionally, plaintiff argues, the plan administrator failed to adequately investigate
20 her claim because the two physicians it consulted, although Board certified in orthopedics,
21 did not specialize in foot and ankle injuries. The Court disagrees. Federal regulations
22 interpreting ERISA require that plan administrators making an adverse benefit
23 determination based on medical judgment "shall consult with a healthcare professional who
24 has appropriate training and experience in the field of medicine involved in the medical
25 judgement." 29 C.F.R. § 2560.503-1(h)(3)(iii). It constitutes an abuse of discretion for an
26 administrator to rely on the opinion of a physician who has no expertise in the relevant field.
27 See Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 535, 538 (9th Cir. 1990) (holding
28 administrator erred in relying on opinion of doctor who had no experience in treating autism

1   and who based his opinion on informal conversations with psychiatrists); see also Zavora v.
2   Paul Revere Life Ins. Co, 145 F.3d 1118, 1122-23 (9th Cir. 1998) (holding administrator
3   erred in denying benefits where claim based on eye injury and administrator relied on
4   opinion of physician who was not ophthalmologist).  Plaintiff cites to no authority, nor has
5   the Court located any, holding a plan administrator may rely only on opinions from
6   physicians practicing within the same sub-specialty as the claimant's treating physician.
7        In sum, the plan administrator clearly explained to Broyles what additional
8   information was needed to support her claim, allowed ample time for her to provide such
9   supplemental information, and relied on opinions from qualified medical personnel.
10  Consequently, Broyles has not demonstrated the existence of a conflict of interest beyond
11  the structural conflict conceded by Standard, nor has Broyles identified any other conduct
12  warranting a heightened degree of skepticism.  Accordingly, the Court will review the
13  administrator's exercise of discretion with a low level of skepticism.
14  **B.    Standard's Exercise of Discretion**
15       When reviewing for abuse of discretion, the Court "cannot substitute [its] judgment
16  for the administrator's. . . [and] can set aside the administrator's discretionary determination
17  only when it is arbitrary and capricious."  Jordan v. Northrop Grumman Welfare Benefit
18  Plan, 370 F.3d at 875.  "An ERISA administrator abuses its discretion only if it (1) renders a
19  decision without explanation, (2) construes provisions of the plan in a way that conflicts with
20  the plain language of the plan or (3) relies on clearly erroneous findings of fact."  Boyd v.
21  Bert Bell/Pete Rozelle N.F.L. Ret. Plan, 410 F.3d 1173, 1178 (9th Cir. 2005).  Here, Broyles
22  does not argue that Standard failed to explain its denial or erred in construing any provision
23  of the Plan.  Rather, she argues that Standard's decision was based on several clearly
24  erroneous findings of fact.
25       First, Broyles contends that Standard incorrectly interpreted Dr. Pfeffer's statements
26  on the APS form and, further, ignored Dr. Pfeffer's subsequent letter and a letter from
27  another treating physician that stated she was unable to engage in sedentary work.
28  Neither such assertion is supported by the record.  An ERISA administrator must have a

11

1  reasonable basis for its decision, and may not arbitrarily refuse to credit a claimant's
2  reliable evidence. Black & Decker, 538 U.S. at 834. The administrator is not required,
3  however, to give special deference to the opinions of treating physicians, and may rely on
4  the opinions of its own consultants. Id. Additionally, simply because "the administrator
5  ultimately rejects the applicant's physicians' views does not establish that it ignored them."
6  Jordan, 470 F.3d at 878.

7  Here, contrary to Broyles's characterization of the APS form, Dr. Pfeffer's
8  statements were unclear and open to conflicting interpretations. See AR 181.
9  Consequently, the administrator's interpretation of Dr. Pfeffer's remarks as stating Broyles
10 could engage in sedentary work was not clearly erroneous. Moreover, both physician
11 consultants considered Dr. Pfeffer's subsequent clarifying letter and Dr. Shifflett's letter,
12 each of which stated Broyles was unable to engage in sedentary work. AR 273-75. The
13 consultants, however, found the conclusions reached therein were unsupported by
14 Broyles's medical records. Dr. Mandiberg notes, for example, that "[t]here is nothing in the
15 medical records in the way of doctors' notes to support [Dr. Pfeffer and Dr. Shifflett's]
16 statements," and that "nobody has given a reason why a person with foot problems cannot
17 do a sedentary job." AR 273-274. Under such circumstances, the administrator did not
18 abuse its discretion in relying on the reports of two qualified physician consultants who
19 disagreed with plaintiff's treating physicians.

20 Next, Broyles contends that Standard did not consider the records relating to the
21 physical therapy she received. Broyles submitted her physical therapy records on
22 October 27, 2006, in connection with her appeal, AR 255-56, and the records were
23 provided to the physician consultants who reviewed Broyles's file. Dr. Waldram noted, for
24 example, that he received and reviewed the physical therapy records, as well as
25 information regarding Broyles's 2006 knee replacement surgery. AR 266. Additionally,
26 Standard's final denial letter references the physical therapy records, see AR 419-24,
27 noting, inter alia, that the physical therapy discharge report included the opinion that
28 Broyles had "progressed to a point of tolerating at least 45 minutes of consistent

12

cardiovascular exercise," and that she was discharged from physical therapy because she informed her therapist that she wanted to discontinue physical therapy and join a gym, AR 422.

Third, Broyles contends, Standard should have considered whether her two knee replacement surgeries, which occurred in 2006 and 2007, prevented her from engaging in sedentary work. As Standard noted in its denial letters, plaintiff's coverage, under the terms of the Plan, lapsed on December 8, 2005, well before either of the surgeries was performed.[6] Consequently, any disability resulting from the surgeries was not covered under the Plan, and the plan administrator did not abuse its discretion in failing to consider such subsequent information when making its disability determination. Moreover, irrespective of whether Standard had an obligation to consider Broyles's knee surgery and planned knee surgery, it nonetheless provided information about those procedures to its physician consultants, who included the information in their reviews. AR 267, 274. Dr. Waldram, who conducted the initial independent review of plaintiff's file, expressly noted that Broyles's medical condition following knee surgery would not interfere with her ability to work in a sedentary position. AR 265.

Broyles further contends that Standard failed to consider her own reports of pain. The record as to Broyles's self-reported symptoms, however, contains information inconsistent with a finding of disabling pain. For example, in October 2005, although Broyles reported to her physical therapist that she had pain in her toe and heel, she told her physical therapist that she was able to work at a desk. AR 247. Additionally, as noted, plaintiff's physical therapy discharge report stated she was able to tolerate at least 45

---

[6] Broyles contends that although the surgeries did not occur until after her coverage had lapsed, the administrator nonetheless should have considered her knee problems because, according to Broyles, symptoms of a degenerative condition do not appear "out of nowhere like a Jack in the Box" and were present during the period when she was covered by the LTD plan. (See Broyles's Brief Supp. J'ment at 15.) Again, the administrative record does not support Broyles's argument. Pain diagrams filled out by Broyles as part of her physical therapy program in September 2005 and January 2006 do not show that she was experiencing pain in her knees. AR 245, 250. Indeed, there is no indication in the record that Broyles had any problems with her knees until February 2006, when she began treatment with Dr. Shifflett. AR 254.

minutes of consistent cardiovascular exercise, and, further, that she was able to "minimize" her foot and ankle pain with the use of crutches. AR 252.

In light of such conflicting information, both as to the severity of, and factors precipitating, Broyles's pain, the administrator's interpretation of the record, and determination that Broyles's pain was not disabling, were reasonable and not based on clearly erroneous findings of fact. See Jordan, 370 F.3d at 879; Snow v. Standard Life Ins. Co., 87 F.3d 327, 331-32 (9th Cir. 1996) (holding denial of benefits not abuse of discretion "where there is relevant evidence [that] reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence.") (alteration in original) (internal quotation and citation omitted), overruled on other grounds by Kearney v. Standard Ins. Co., 175 F.3d 1084 (9th Cir. 1989) (en banc).

Lastly, Broyles's claims the plan administrator relied on an erroneous synopsis of her medical records, which synopsis was prepared by one its employees. In particular, the synopsis incorrectly stated that at the time Broyles ceased working, she was only taking the over-the-counter medication Aleve to manage her pain, when in fact she also was taking prescription medications at the time. AR 212-214, 267. Although the synopsis is, in part, incorrect, the record is devoid of any evidence that it had an impact on the plan administrator's decision to deny benefits. None of the letters explaining the denial of Broyles's claim mentions the synopsis. Indeed, it was never sent to Dr. Waldram, who based his conclusions on plaintiff's prescription records, which were forwarded to him for review. AR 212-14. Although the synopsis was sent to Dr. Mandiberg, he also received a complete copy of Broyles's prescription records, and there is no reference in his report to the inaccurate statement, let alone to his reliance thereon. Because the plan administrator did not base its decision on the incorrect information in the synopsis, plaintiff's contention that the denial was premised on clearly erroneous facts is without merit.

Having considered the administrative record and the parties' respective arguments with respect thereto, the Court finds the plan administrator did not abuse its discretion in finding Broyles did not meet the Plan's definition of disabled. Accordingly, defendant and

real party in interest are entitled to judgment on Broyles's claim for benefits.

## CONCLUSION

For the reasons stated above:

1. Plaintiff's motion for judgment on her claim for benefits is hereby DENIED.

2. Defendant and real party in interest's cross-motion for judgment on plaintiff's claim for benefits is hereby GRANTED.

**IT IS SO ORDERED.**

Dated: November 12, 2009

_____
MAXINE M. CHESNEY
United States District Judge